IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
May 10, 2000 Session

**STATE OF TENNESSEE v. STANLEY BLACKWOOD**

**Appeal as of Right from the Circuit Court for Madison County**
**No. 96-541      Franklin Murchison, Judge**

---

**No. W1999-01221-CCA-R3-CD - Filed November 2, 2000**

---

A Madison County Grand Jury indicted the defendant, Stanley Blackwood, for one count of first-degree murder, three counts of attempted first-degree murder, five counts of aggravated assault, two counts of reckless endangerment and one count of aggravated burglary. Following a trial, a jury convicted the defendant on all counts, and the trial court imposed an effective sentence of life plus twenty-two (22) years incarceration. On appeal, the defendant contends (1) that the evidence was insufficient to sustain all of the convictions; (2) that the trial court erroneously instructed the jury; (3) that the trial court erroneously refused to admit results of a polygraph examination; (4) that the trial court should have merged two counts of aggravated assault with two counts of attempted first-degree murder; and (5) that the defendant's sentence was excessive. After a thorough review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court of Madison County**
**is Affirmed**

JERRY L. SMITH, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT W. WEDEMEYER, JJ., joined.

Patrick Martin, Jackson, Tennessee, at trial, and Lloyd R. Tatum, Henderson, Tennessee, on appeal, for appellant, Stanley Blackwood.

Paul G. Summer, Attorney General & Reporter, Mark E. Davidson, Assistant Attorney General, Nashville, Tennessee and Jerry Woodall, District Attorney General, Al Earls, Assistant District Attorney, for appellee, State of Tennessee.

# OPINION

## Factual Background

Bonnie Massengill, the principal victim in this case, lived with her parents, Rebecca and Pete Carey, and her two daughters, eleven-year-old Crystal Carey and four-year-old Summer Massengill in May, 1996. On the evening of May 28, 1996, Ms. Massengill was working on her father's race car in a garage on the property with two friends, Jack Lawrence III and Jerry Williford, when the defendant came to visit Ms. Massengill. He greeted Mr. Lawrence and Mr. Williford, and then asked Ms. Massengill to accompany him outside. Once outside, the defendant fired two shots at Ms. Massengill, who fell and screamed as she was hit. The defendant then fired a third shot into her head after she lay on the ground. The victim's parents, Rebecca and Pete Carey, were inside the house when the shots were fired. After hearing the shots, Pete Carey retrieved a gun and both Pete and Rebecca Carey tried to go outside to help their daughter. While Mr. and Mrs. Carey were outside, the defendant fired several shots at the couple. Mr. and Mrs. Carey ran back in the house where their granddaughters were. Mrs. Carey then called 911, took the two girls and hid inside the house. The defendant then came into the house, yelled "hey," and shot his gun in the house several times. The defendant went back into the yard, and, at some point, went into the garage, where Mr. Williford was hiding. The defendant then threatened Mr. Williford and shot inside the garage. Mr. Williford was not hit. Officers Gary Benton, Jackie Mills, and Barry Austin, all of the Jackson Police Department, arrived shortly thereafter.[1] Officer Benton told the defendant to drop his weapon, and the defendant responded by shooting twice at the Officers. Police apprehended the defendant after he ran out of ammunition.

On September 3, 1996, a Madison County Grand Jury indicted the defendant as follows: count one, first-degree murder of Bonnie Massengill; count two, attempted first degree murder of Pete Carey; count three, aggravated assault of Pete Carey; count four, attempted first-degree murder of Rebecca Carey; count five, aggravated assault of Rebecca Carey; count six, reckless endangerment of Crystal Carey; count seven, reckless endangerment of Summer Massengill; count eight, attempted first-degree murder of Officer Gary Benton; count nine, aggravated assault of Officer Gary Benton; count ten, aggravated assault of Officer Jackie Mills; count eleven, aggravated assault of Officer Barry Austin; and count twelve, aggravated burglary of Pete and Rebecca Carey. The defendant was tried on October 14, 1997.

At trial, the state's first witness was Crystal Carey, Ms. Massengill's oldest daughter. In May, 1996, eleven-year-old Crystal was living with her grandparents, Pete and Rebecca Carey, her mother and her younger sister. On May 28, 1996 at about 10:00 p.m., Crystal and Summer were in the house watching television while her mother was outside working on Pete Carey's race car with some friends. Crystal testified that she heard two "pops" or loud noises outside. She was not initially startled, because the race car often made loud noises. However, she then heard her mother yell for Mr. Carey, and that she had been shot. Crystal testified that she went to the back door to see

---

[1]Since the shooting, Officer Jackie Mills married Officer Gary Benton; accordingly, her married name, and her name at the time of trial, is Jackie Mills Benton.

what had happened. There, she saw the defendant pointing a gun at her mother, and she saw her mother bleeding. Crystal stated that she went to get Pete Carey, who got his gun and went out the back door. Mrs. Carey called the police, and then also went outside. While Mr. and Mrs. Carey were outside, Crystal heard two more shots, after which Mr. and Mrs. Carey came inside. Once inside, Mr. and Mrs. Carey took Crystal and her sister into the back bedroom and told her to get down. The next thing Crystal heard was the defendant come in the back door. Crystal testified that the defendant yelled "hey" and fired his gun three or four times into the living room. Crystal hid until the police came and apprehended the defendant.

Officer Mike Turner, a Crime Scene Technician and Evidence Custodian for the Jackson Police Department, was the state's next witness. He testified that he recovered an empty Glock .40 caliber semiautomatic handgun, fifteen (15) shell casings and six (6) bullets and/or bullet fragments from the crime scene. Three (3) shell casings were found inside the house, not far from the back door, and there were four (4) bullet holes in the living room wall. Officer Turner testified that, based on the location of the shell casings and the bullet holes, the shooter stood inside the house when he shot into the living room. Officer Turner also stated that a "speed loader" and a shoulder holster were recovered from the defendant. Agent Steve Scott of the Tennessee Bureau of Investigation testified that all of the bullets and all of the shell casings were .40 caliber, and that all of the shell casings came from the gun recovered at the crime scene. He could not be sure that all of the bullets were fired from the gun found on the scene.

Next, Dr. Wendy Gunther, an Assistant Medical Examiner and Forensic Pathologist for Shelby County, testified that she examined Ms. Massengill's body after Ms. Massengill died. Dr. Gunther told the jury that Ms. Massengill was shot three times: once in the nostril, once in the arm, and once in the torso. Dr. Gunther opined that, although Ms. Massengill was alive when she received each wound, the gunshot to the head would have proven fatal immediately.

The state's next witness was Jack Lawrence III. He testified that he was at the Carey residence on May 28, 1996, working on Mr. Carey's race car with Jerry Williford and Bonnie Massengill in the garage, when the defendant came to visit. Mr. Lawrence stated that the defendant asked Ms. Massengill to accompany him outside, and she did. A minute or two after the defendant and Ms. Massengill went outside, Mr. Lawrence heard two or three shots being fired. Mr. Lawrence walked outside, and saw Ms. Massengill and the defendant. Ms. Massengill was lying on the ground, yelling "Daddy, Daddy, he shot me," and the defendant had a pistol in his hand. Mr. Lawrence ran about three-hundred (300) yards away from the Careys' house, but he heard one or two more shots after he stopped running. Mr. Lawrence did not return until police arrived.

Jerry Williford testified next. On May 28, 1996, Mr. Williford was also working on Mr. Carey's race car with Ms. Massengill and Mr. Lawrence when the defendant came to visit. Mr. Williford stated that the defendant asked Ms. Massengill to go outside with him, and she did. Mr. Williford heard a noise that sounded like fireworks, and then heard Ms. Massengill say "Daddy, he shot me" or something to that effect. Mr. Williford testified that he went outside and saw Ms. Massengill and the defendant, and the defendant had a gun. Mr. Williford stated that he and Mr. Lawrence went back inside the garage, and that Mr. Lawrence ran away. Then, Mr. Williford either came out or looked out of the garage, and he saw Pete Carey at the back door . Mr. Carey had a gun, but did not fire it. Mr. Carey told the defendant to put the gun down, but the defendant fired several shots at Mr. Carey.

Mr. Williford testified that he went back in the garage and hid behind a wall in the back room. The defendant then came in the opposite side of the garage and said "you S.O.B., I am going to get you too" and then fired his gun in the garage. Mr. Williford testified that he was afraid he was going to die. However, the next shots Mr. Williford heard came from outside. Mr. Williford stayed in the garage until police arrived.

Rebecca Carey, Bonnie Massengill's mother, was the state's next witness. She testified that on May 28, 1996, she was at home with her two granddaughters, Crystal Carey and Summer Massengill. Mrs. Carey testified that Ms. Massengill, Mr. Williford and Mr. Lawrence were all working in the garage that night, and that her granddaughters were watching television in the house. At about 9:45 p.m., after Mrs. Carey had gone to bed, her husband, Pete Carey, came home and also went to bed. Soon after Mr. Carey came to bed, the couple heard shots outside. Mr. and Mrs. Carey started to get up when Crystal came in and said "[the defendant] shot my momma." Mr. Carey proceeded to go outside, but Mrs. Carey initially stayed behind him and tried to keep her granddaughters from going outside. At some point, Mrs. Carey called 911. Mrs. Carey testified that she finally went outside as Mr. Carey was trying to come back in. When Mrs. Carey looked outside, she saw her daughter standing in the back yard, holding her arm with "blood all over her." Mrs. Carey pushed the back door open, and the defendant pointed a gun at Mrs. Carey and fired. Scared that she would die, Mrs. Carey dropped to the floor and pulled her granddaughters down with her. She took the girls and crawled in a bedroom to hide. After she hid, Mrs. Carey heard the defendant come in the back door and yell "hey." Then, she heard several shots being fired in the house. Mrs. Carey testified that she stayed there until the police came.

Mr. Carey, Ms. Massengill's father, died of natural causes before the trial, so the state read Mr. Carey's testimony from the defendant's preliminary hearing to the jury. Mr. Carey testified at the preliminary hearing that he was in bed around 10:00 p.m. on May 28, 1996. Mr. Carey heard gunshots fired outside, and he looked out his window. He could not see anything, but one of his granddaughters came in his room and told him that his daughter had been shot. Mr. Carey went out the back door and saw his daughter with blood on her shirt. The defendant was on top of her. Mr. Carey told the defendant to get off of Ms. Massengill, and the defendant shot at Mr. Carey three or four times. Mr. Carey testified that he went back in the house, and the defendant came in after them. Mr. Carey went to one bedroom, while Mrs. Carey took her grandchildren and went to another. The defendant yelled "hey" and shot into the house several times. Mr. Carey waited until the police came, and he told them that the defendant was in back of the house.

Jackson Police Officer Barry Austin was the next to testify. Officer Austin told the jury that on May 28, 1996, at approximately 10:15 p.m., he was dispatched to the Carey residence along with Officer Jackie Mills and Officer Gary Benton. The Officers went to the front of the residence where they were met by Pete Carey. Mr. Carey told the Officers that someone was in the back of the residence with a gun and that someone had been shot. Officer Austin followed Officer Benton to the back of the residence. Before they got there, however, Officer Austin heard a gunshot and, scared of receiving serious bodily injuries, took cover behind the corner of the house. Officer Benton continued toward the garage. Officer Austin then got up and walked across the driveway and he heard another shot. He looked in the backyard and saw two people, one of whom was the defendant, lying on the ground. The defendant had an automatic pistol in his hand. The pistol's slide was locked back, indicating that the pistol was out of ammunition. Officer Austin advised the other

Officers of the defendant's location and proceeded to approach the defendant. He told the defendant to drop his gun, and the defendant did so. Officer Austin and the other Officers proceeded to arrest the defendant.

Officer Gary Benton of the Jackson Police Department testified next. Officer Benton testified that on May 28, 1996, he received a report of small arms fire at the Carey residence. Officers Benton, Austin and Mills were dispatched to investigate. Officer Benton testified that when he and the other Officers arrived at the residence, they were greeted by Pete Carey, who was standing in front of the house. Mr. Carey told the Officers that "he shot one of them" and indicated that "he" was in back of the house. Officer Benton went toward the back of the house with Officers Austin and Mills behind him. He saw Ms. Massengill lying on the ground and the defendant, armed with a pistol, lying on top of her. Officer Benton told the defendant to drop the gun, and the defendant fired at the Officer. Officer Benton, scared for his life, ran for cover, at which time he heard another shot. Then, Officer Austin approached the defendant, who by this time was out of ammunition. The Officers then took the defendant into custody.

The state's next witness was Jackie Mills. She also testified that she was dispatched to the Carey residence on May 28, 1996. Officer Mills told the jury that when the Officers went behind the house to investigate, Officer Benton told the defendant to drop the gun. Then, Officer Mills heard a gunshot, and she and the other Officers "scattered." Although she did not know where the shot came from, Officer Mills was scared for her life. Officer Mills heard another gunshot before the Officers apprehended the defendant. She told the jury that, after the defendant was apprehended, she tried to help Ms. Massengill. Ms. Massengill was bleeding, but still breathing. Then, paramedics arrived and took over.

The state's final witness was Officer Calvin Scott of the Jackson Police Department. On May 28, 1996, Officer Scott was dispatched to the Carey residence. When Officer Scott arrived at the residence, the defendant had already been taken into custody. Officer Scott testified that he transported the defendant to the police station. Officer Scott recovered a shoulder holster, a .40 caliber round of ammunition, and a "magazine speed loader" from the defendant's person. The state rested.

The defendant testified on his own behalf. He told the jury that he and Ms. Massengill had dated in the past. He stated that, on May 28, 1996, he went to the Careys' house to give Ms. Massengill a gun to use for protection. He told the jury that when he arrived at the Careys' house, he found Ms. Massengill working on Mr. Carey's race car in the garage. The defendant said that he saw Mr. Williford and Mr. Lawrence in the garage with Ms. Massengill, and he said hello to them. The defendant showed Ms. Massengill his gun, and he injected a round of ammunition into the chamber so that Ms. Massengill could see how the gun operated. Next, he ejected that round, picked the bullet up and put it in his pocket. He then chambered another round. The defendant claimed that Mr. Williford and Mr. Lawrence asked the defendant why he had a gun, and he replied "don't worry about it." He asked Ms. Massengill to accompany him outside, which she did. The defendant testified that, as they were walking, he lifted the gun up and jokingly pretended that he was "taking [Ms. Massengill] hostage or hijacking her – just a funny gesture – we both kind of chuckled about it." He told the jury that Ms. Massengill then reached out to push the barrel away from her, the two bumped together and her hand slid forward and pushed his hand which was on the trigger. The

defendant testified that the gun went off twice and scared him. He claimed that after the first two shots, Ms. Massengill fell and grabbed the defendant's hands, and the gun went off a third time.

At that time, Mr. Carey came out of his house. The defendant claimed that he saw Mr. Carey and told him to get help. The defendant then tried to let Ms. Massengill lay down, but he accidentally fell on top of her. The defendant claimed that this upset Mr. Carey, who was now armed with a pistol. Mr. Carey told the defendant to get off Ms. Massengill. The defendant claimed that Mr. Carey then fired his pistol at the defendant In response, the defendant shot his gun in the air twice to frighten Mr. Carey. The defendant's strategy worked, and Mr. Carey went back into the house.

Next, the defendant testified that he heard something behind him, and he was afraid that Mr. Lawrence or Mr. Williford were going to "charge him," so he shot twice toward the garage area to prevent an attack. The defendant claimed that after he shot toward the garage, he decided to go for help. He went over to the garage area to find Mr. Lawrence or Mr. Williford, but had no luck. Then, the defendant saw Mrs. Carey walking near Ms. Massengill, and he told Mrs. Carey to go for help. When Mrs. Carey failed to respond, the defendant "shot a couple of shots up in the air to scare her to get her to go back inside the house." Mrs. Carey ran back into the house.

The defendant claimed that he went to lie beside Ms. Massengill where he told her that everything would be fine. However, the defendant testified that he became frustrated when help did not arrive quickly enough. At some point the defendant reloaded his gun, and went to the house to use the telephone to call for help. He claimed that he started to worry about Mr. Carey being in the house with a gun, so he shot three or four times at the gas grill near the back door. Then, the defendant went to the back door. He opened the door and yelled "hey," but no one answered him. The defendant saw a television inside the house. He testified that he decided to shoot the television so that someone would get help. The defendant shot the television three times. Although the defendant admitted shooting into the house, he claimed he never actually entered the house.

The defendant testified that he then went back into the back yard and laid down next to Ms. Massengill. He claimed that he heard a noise, so he fired two shots to keep anyone from "charging him." After the second shot, the defendant ran out of ammunition. Police Officers then came and arrested the defendant.

Next, the defendant called three character witnesses, Marcus Smith, Karen Mainord, and Mike McFarland, all of whom testified that the defendant had a good reputation for truth and veracity. Following the character witnesses, the defense rested. Finally, the state called Rebecca Carey on rebuttal. She testified that Ms. Massengill wore a short-sleeved shirt the night she was murdered.

## Sufficiency

On appeal, the defendant claims that the evidence was insufficient to support his convictions for counts one, two, four, eight, nine, ten, eleven and twelve.

Where the sufficiency of the evidence is contested on appeal, the relevant question for the reviewing court is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Harris, 839 S.W.2d 54, 75 (Tenn.1992). The state is entitled to the strongest legitimate view of the evidence as

well as all reasonable and legitimate inferences that may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). In conducting our evaluation of the convicting evidence, this Court is precluded from reweighing or reconsidering the evidence. State v. Morgan, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

Furthermore, a verdict of guilty by the jury, approved by the trial judge, accredits the testimony of the state's witnesses and resolves all conflicts in the testimony in favor of the state. State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994). Although an accused is originally cloaked with a presumption of innocence, a jury verdict removes this presumption and replaces it with one of guilt. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. Id.

The defendant first claims that the evidence was insufficient to support his conviction for the first-degree murder of Bonnie Massengill because the state failed to prove (a) that the defendant had any motive for the killing and (b) that the killing was premeditated. First-degree murder is defined as a "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202 (a)(1). "'Premeditation' means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Id., § 39-13-202 (d). Moreover, premeditation is a question of fact for the jury; it may be inferred from the circumstances surrounding the killing. State v. Gentry, 881 S.W.2d 1, 3 (Tenn. Crim. App. 1993). In this case, the defendant testified that he and Ms. Massengill had been lovers. Armed with a pistol, the defendant went to visit Ms. Massengill at her home. He asked her to accompany him outside, and she did. There, he shot her in ths stomach, in the arm, and in the face. When her family tried to intervene, the defendant shot at them. Indeed, when the police tried to apprehend the defendant, he shot at the police. Furthermore, while proof of motive may help prove premeditation or intent, it is not an element of first-degree murder. See Tenn. Code Ann. § 39-13-202 (a). Thus, lack of proof of motive does not affect our sufficiency determination. In short, the circumstances of the killing, taken as a whole, justify an inference of premeditation. Gentry, 881 S.W.2d at 4-5.

Similarly, the defendant argues that the evidence was insufficient to support his convictions for the attempted first-degree murders of Pete and Rebecca Carey and the attempted first-degree murder of Officer Gary Benton. Tenn. Code Ann. § 39-12-101 defines criminal attempt as follows:

(a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:

(1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;

(2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-13-101. Thus, to support a charge of attempted first-degree murder, the state must prove that the defendant intended to murder the victims with premeditation, and that the defendant acted to accomplish the murder. Here, the evidence showed that the defendant went to Mr. and Mrs. Carey's house armed with a pistol. After Mr. and Mrs. Carey tried to aid their daughter, the defendant shot at the couple several times. Then, he went into the house and fired the weapon several times in the house. Although the defendant testified that he only shot at the Careys in order to warn them and only shot inside the house to force someone to call the police, the jury apparently did not believe him. The evidence supports the jury's finding.

The evidence also supports the jury's finding that the defendant attempted to murder Officer Benton. Officer Benton testified that, after he told the defendant to drop his gun, the defendant fired at the Officer. While Officer Benton attempted to flee, the defendant fired another shot. Although the defendant now claims that "the sole reason the defendant fired his weapon in the direction of the officers was to prevent an attack by a member of the Carey family," the jury chose not to believe the defendant's testimony.

The defendant next claims that the evidence was insufficient to support his convictions for aggravated assault of Officers Benton, Mills and Austin. However, the defendant has failed to provide any argument in support of his contention. In any event, aggravated assault, as charged here, is caused where a defendant intentionally or knowingly causes another to reasonably fear imminent bodily injury and uses or displays a weapon. Tenn. Code Ann. §§ 39-13-101 (a)(2), -102 (a)(1)(B). In this case, the defendant shot in the direction of the police officers as they tried to apprehend them, and all three testified that they feared imminent bodily injury. Given the circumstances, we have no doubt that the Officers' fear was reasonable. Thus, the evidence was sufficient to support the defendant's convictions for aggravated assault.

Finally, the defendant claims that the evidence was insufficient to support his conviction for the aggravated burglary of Pete and Rebecca Carey's house. Aggravated burglary is defined as entering a habitation without the owner's effective consent and with the intent to commit a felony, in this case attempted murder and aggravated assault. Tenn. Code Ann. §§ 39-14-402, -403. In this case, although the defendant admitted that he shot inside the house, he claimed that he never actually entered the house. However, his was the only testimony to that effect. Mr. and Mrs. Carey both testified that the defendant entered the house before he fired his weapon. Furthermore, police recovered several shell casings from inside the house. Finally, Officer Turner guessed that the shooter had been inside the house based on the placement of the shell casings and the bullet holes. The state presented sufficient evidence for the jury to find that the defendant entered the house with the intent to commit a felony with a gun and thus committed aggravated burglary. This issue is without merit.

## Jury Instructions
### A.

The defendant next claims that the trial court erred by refusing to instruct the jury to consider the defenses of self-defense, necessity, and mistake of fact. To support his claim that he was entitled to a self-defense instruction, the defendant points to his own testimony that Mr. Carey shot at the defendant after the defendant accidentally shot Bonnie Massengill. Thus, he argues, he only fired his weapon at the Careys in self-defense. The defendant also argues that his trial testimony showed

that he fired "several shots around the premises and also in the Careys' T.V. in hopes that this would compel someone to call for help for Bonnie." The defendant claims that this testimony supported a jury instruction on necessity. Finally, the defendant testified that he only shot at the police officers because he heard a sound and intended to "dissuade an attack." He claims that he did not know that he was firing at police officers, because his hearing was impaired and he could not hear the officers telling him to drop the gun. Thus, the defendant argues that this testimony supported a jury-instruction on mistake-of-fact.

It is well-settled that the trial court has the duty of giving a correct and complete charge of the law applicable to the facts of the case, and that the defendant has the right to have every issue of fact raised by the evidence and material to the defense submitted to the jury upon proper instructions by the trial court. State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990); State v. Bryant, 654 S.W.2d 389, 390 (Tenn. 1983). The defendant is correct that self-defense, necessity and mistake of fact are not affirmative defenses. Rather, they are merely defenses; if the evidence fairly raises a defense, the trial court must submit the defense to the jury and must instruct the jury that any reasonable doubt on the existence of the defense requires acquittal. Tenn. Code Ann. §§ 39-11-203, -502, -609, -611; State v. Bult, 989 S.W.2d 730, 733 (Tenn. Crim. App. 1998); State v. Culp, 900 S.W.2d 707, 710 (Tenn. Crim. App. 1994); State v. McPherson, 882 S.W.2d 365, 374 (Tenn. Crim. App. 1994).

The jury should not have been instructed on the law of self-defense. Tennessee defines self-defense as follows:

> A person is justified in threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. The person must have a reasonable belief that there is an imminent danger of death or serious bodily injury. The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds.

Tenn. Code Ann. § 39-11-611(a). Here, the defendant testified that he believed he was under attack because Mr. Carey shot at him. However, the defendant claimed that he only fired his own gun in the air after he was attacked; he denied shooting at anyone. Therefore, notwithstanding the improbability of the defendant's testimony, he was not entitled to a self-defense instruction, because even according to his own testimony, he did not intentionally fire at anyone.

Moreover, even if the jury believed that the defendant believed he was under attack and fired at Mr. Carey to ward off the attack, a self-defense instruction would not have been warranted. As quoted above a self-defense instruction is warranted where "the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of *unlawful* force." Tenn. Code Ann. § 39-11-611(a)(emphasis added). Here, Mr. Carey's alleged use of force was not unlawful. Tennessee Code Annotated section 39-11-612 provides

> A person is justified in threatening or using force against another to protect a third person if:

(1) Under the circumstances as the person reasonably believes them to be, the person would be justified under § 39-11-611 in threatening or using force to protect against the use or attempted use of unlawful force reasonably believed to be threatening the third person sought to be protected;  and

(2) The person reasonably believes that the intervention is immediately necessary to protect the third person.

Tenn. Code Ann. 39-11-612.  According to all of the witnesses, including the defendant, the defendant had already shot Ms. Massengill when Mr. Carey exited the house.  Thus, even assuming Mr. Carey used force against the defendant, his use of force was lawful.

Similarly, we do not agree with the defendant's argument that the facts in this case support a trial court instruction on the defense of necessity.   The defense of necessity is available when:

(1) the person reasonably believes the conduct is immediately necessary to avoid imminent harm;  and

(2) the desirability and urgency of avoiding the harm clearly outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct.

Tenn. Code Ann. § 39-11-609.

Under this section, conduct which would ordinarily be criminal is justified if the accused reasonably believes that the conduct is necessary to avoid imminent harm.  In other words, to be entitled to the defense of necessity, the defendant must show an immediately necessary action, justifiable because of an imminent threat, where the action is the only means available to avoid the harm.  State v. Watson, 1 S.W.3d 676, 678 (Tenn. Crim. App. 1999).  In this case, the defendant testified that he fired his gun several times in order to force someone to phone the police.  However, the defendant never testified that he thought that firing his gun was the *only* means available to summon help.  Indeed, even if the defendant actually believed that gunshots were necessary to summon help, it strains credibility to accept that the defendant's belief was reasonable.  Under these circumstances we cannot find error in the trial court's decision not to instruct the jury regarding the defense of necessity.

Finally, we reject the defendant's contention that the trial court should have instructed the jury about the "mistake of fact" defense.  The defendant claims that the instruction was warranted because he did not realize that he was shooting at police officers.  Thus, he argues that he fairly raised mistake of fact as a defense to the aggravated assaults and attempted murder of the officers. Mistake of fact is available as a defense if it negates the necessary culpable mental state of the accused. Tenn. Code Ann. § 39-11-502.  Here, the defendant has not raised the defense, because he claimed that he shot into the air, not at the police officers.  In other words, if the jury believed the defendant, there would be no culpable mental state to negate.

Furthermore, even if the jury believed that the defendant fired at police because he mistakenly thought his police were attackers, he would still not have been entitled to a mistake of fact defense instruction, because his beliefs, even if reasonable, would not have justified his actions.

-10-

Like Mr. Carey, the police were acting in defense of a third person; thus, their use of force would not have been unlawful. Tenn. Code Ann. 39-11-612.

B.

Next, the defendant claims that the trial court should have instructed the jury to consider voluntary manslaughter as a lesser offense of first-degree murder and attempted voluntary manslaughter as a lesser offense of attempted first-degree murder. Because the defendant did not raise this issue in his motion for new trial, the issue is waived. T.R.A.P. 3(e).

We note that the defendant's rights have not been vitiated by this waiver. The proof did not warrant a jury instruction regarding voluntary manslaughter or attempted voluntary manslaughter, because a trial court must instruct the jury on lesser-included offenses only if the evidence at trial is legally sufficient to support a conviction for the lesser offense. State v. Burns, 6 S.W.3d 453, 464 (Tenn. 1999). In this case, the evidence adduced at trial did not support a voluntary manslaughter charge because there was no proof that the defendant was provoked. "Voluntary manslaughter is the intentional or knowing killing of another [committed] in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211. The defendant testified that he accidentally shot Ms. Massengill, and that the other shots were mere warnings. Therefore, even if the defendant's testimony was believable, there was absolutely no evidence whatsoever of provocation. Cf. State v. Ruane, 912 S.W.2d 766, 783 (Tenn. Crim. App. 1995)(holding that the trial court's failure to instruct jury regarding voluntary manslaughter required reversal even where there was only slight evidence of provocation).

Furthermore, regarding the murder of Bonnie Massengill, the trial court instructed the jury to consider first-degree murder, second-degree murder, reckless homicide and criminally negligent homicide. Regarding the attempted murders of Pete Carey, Rebecca Carey, and Officer Benton, the court instructed the jury to consider attempted first-degree murder and attempted second-degree murder. Where the record clearly shows that the defendant was guilty of the greater offense and is devoid of any evidence permitting an inference of guilt of the lesser offense, it is not error to fail to charge on a lesser offense. State v. Boyd, 797 S.W.2d 589, 593 (Tenn. 1990)(citing State v. King, 718 S.W.2d 241, 245 (Tenn.1986)). See also, State v. Williams, 977 S.W.2d 101, 106 (Tenn. 1998)(holding that "trial court's erroneous failure to charge voluntary manslaughter is harmless beyond a reasonable doubt because the jury's verdict of guilt on the greater offense of first degree murder and its disinclination to consider the lesser included offense of second degree murder clearly demonstrates that it certainly would not have returned a verdict on voluntary manslaughter.")

The jury rejected the defendant's contention that he acted recklessly, negligently or even knowingly. Thus, the trial court's failure to instruct on voluntary manslaughter was not error. See Boyd, 797 S.W.2d at 593 (holding that, in a first-degree murder prosecution, a trial court's failure to instruct on voluntary manslaughter was not error where jury was instructed to consider second-degree murder but convicted of first-degree murder). This issue is without merit.

**Polygraph Results**

Prior to trial, the defendant moved the trial court to admit results of a polygraph examination. The trial court denied the motion, and the defendant now claims that the trial court erred. He further claims that a per se ban on the admission of polygraph results as evidence is outdated under

-11-

McDaniel v. CSX Transportation, 955 S.W.2d 257 (Tenn. 1997). In Tennessee, it is well-settled that the results of a polygraph examination are not admissible as evidence in a criminal prosecution. Irick v. State, 973 S.W.2d 643, 652 (Tenn. Crim. App. 1998); State v. Campbell, 904 S.W.2d 608, 614 (Tenn. Crim. App. 1995). This "unwavering principle . . . even applies to prevent the criminal defendant from introducing polygraph evidence that would be helpful to his case." Cohen, Paine and Sheppeard, Tennessee Law of Evidence, § 401.34 at 142 (3d ed. 1995)(citing State v. Irick, 762 S.W.2d 121, 127 (Tenn. 1988)). The defendant has not pointed to anything in the Tennessee Rules of Evidence or case law that requires us to abandon this well-settled principle. This issue is without merit.

## Double Jeopardy

The defendant next claims that the trial court should have merged count two with count three (attempted murder and aggravated assault of Pete Carey, respectively) and count four with count five (attempted murder and aggravated assault of Rebecca Carey, respectively). He claims that the charges violated his constitutional protection against double jeopardy because the facts supporting the attempted murder charges were the same facts that supported the aggravated assault charges.[2]

To determine whether multiple convictions are permitted, this Court must: (1) conduct an analysis of the statutory offenses pursuant to Blockburger v. United States, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932); (2) analyze the evidence used to prove the offenses; (3) consider whether there were multiple victims or discrete acts; and (4) compare the purposes of the respective statutes. State v. Denton, 938 S.W.2d 373, 381 (Tenn. 1996).

Under Blockburger, one must determine whether each offense requires proof of an additional fact which the other does not. Aggravated assault requires proof that a defendant intentionally or knowingly caused another to reasonably fear imminent bodily injury and uses or displays a weapon. Tenn. Code Ann. §§ 39-13-101 (a)(2), -102 (a)(1)(B). The offense of attempt to commit first-degree murder requires proof that defendant unlawfully attempted to kill the victim and that the attempt to kill was intentional and premeditated. Tenn. Code Ann. §§ 39-12-101, 39-13-202 (a)(1). Aggravated assault requires proof that defendant caused the victim to bodily injury; attempted first degree murder does not. Attempted first degree murder requires proof that defendant intended to kill his victim; whereas, aggravated assault does not. Application of the Blockburger test indicates that the legislature intended to allow separate punishments for these offenses. State v. Adams, 973 S.W.2d 224, 229 (Tenn. Crim. App. 1997).

Our analysis of evidence used to prove the offenses is guided by Denton, 938 S.W.2d at 373. Denton specifically addresses the due process issues inherent in a double jeopardy analysis by evaluating the specific evidence used to prove each offense. Id. at 383. In that case, the state relied on exactly the same evidence to establish both an aggravated assault and an attempted voluntary manslaughter charge. Id. That is not the case here. In order to establish attempted first-degree murder, the state relied on the evidence that the defendant fired his gun at the Careys when they

---

[2] Although our analysis is based on Article I, § 10 of the Tennessee Constitution, the result would be the same under the federal double jeopardy clause, because an analysis under the federal double jeopardy clause is limited to the Blockburger test. United States v. Dixon, 509 U.S. 688, 703-05, 113 S. Ct. 2849, 125 L. Ed. 2d 556 (1993).

came out of the house. However, the defendant also entered the house after the above incident and fired his gun inside the house. That separate incident was sufficient to establish aggravated assault independent of the evidence used to establish attempted first-degree murder.

Moreover, although the purposes of statutes are similar, i.e., to protect the person, nearly any two criminal offenses can be considered of singular purpose if viewed broadly enough. See State v. Lawrence, 995 S.W.2d 142, 146 (Tenn. Crim. App. 1998). Finally, although all of the charges arose from one course of conduct, discrete acts support each of the charges. See Duchac v. State, 505 S.W.2d 237, 240 (Tenn. 1973). Thus, the trial court correctly failed to merge the aggravated assaults of Pete and Rebecca Carey with the attempted first-degree murders of Pete and Rebecca Carey. This issue is without merit.

## Sentencing

The defendant was sentenced to twenty-two (22) years for the attempted murder of Officer Benton. The court found that the defendant was a "dangerous offender" and accordingly ordered that sentence served consecutively to the other counts, all of which were ordered to be served concurrently to each other. On appeal, the defendant challenges the imposition of consecutive sentences.

"When reviewing sentencing issues . . . the appellate court shall conduct a de novo review on the record of such issues. Such review shall be conducted with a presumption that the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d). "However, the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In conducting our review, we must consider all the evidence, the presentence report, the sentencing principles, the enhancing and mitigating factors, arguments of counsel, the defendant's statements, the nature and character of the offense, and the defendant's potential for rehabilitation. Tenn. Code Ann. §§ 40-35-103(5), -210(b); Ashby, 823 S.W.2d at 169. "The defendant has the burden of demonstrating that the sentence is improper." Id.

Consecutive sentencing is governed by Tennessee Code Annotated section 40-35-115. The trial court has the discretion to order consecutive sentencing if it finds that one or more of the required statutory criteria exist. State v. Black, 924 S.W.2d 912, 917 (Tenn. Crim. App. 1995). Further, when imposing consecutive sentencing based on a finding that a defendant is a "dangerous offender", the court is required to determine whether the consecutive sentences (1) are reasonably related to the severity of the offenses committed; (2) serve to protect the public from further criminal conduct by the offender; and (3) are congruent with general principles of sentencing. State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999); State v.. Wilkerson, 905 S.W.2d 933, 939 (Tenn. 1995).

In this case, although the trial court made no explicit reference to the Wilkerson factors, its findings satisfy the criteria articulated in that case. First, consecutive sentences are reasonably related to the severity of the defendant's offenses. As the trial court noted, this was a case involving several victims and numerous crimes, the most severe of which was the murder of Bonnie Massengill. The defendant "was shooting or threatening various individuals at random . .

. [and did so] until police arrived. When the police arrived, the defendant was still ready and willing to shoot, and he did shoot." Second, consecutive sentences are required in this case in order to protect the public from further criminal conduct by the defendant. There were eight victims in this case, several of whom were police officers. The trial court also noted that "[c]rimes of violence are a real problem [in our community]. It's got to stop." Finally, we find that consecutive sentencing in this case is congruent with general principles of sentencing. This case could have resulted in a wholesale massacre of numerous victims. Clearly, consecutive sentencing was proper given the seriousness of these crimes. This issue has no merit.

Accordingly, the judgment of the trial court is AFFIRMED.


_____

JERRY L. SMITH, JUDGE